Nos. 13-1678, 14-1014

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

JAPANESE FOUNDATION FOR CANCER RESEARCH,

Plaintiff-Cross Appellant

v.

MICHELLE K. LEE, Deputy Undersecretary of Commerce for Intellectual Property and Deputy Director of the U.S. Patent and Trademark Office; UNITED STATES PATENT AND TRADEMARK OFFICE,

Defendants-Appellants.

On Appeal From the United States District Court for the
Eastern District of Virginia in Case No. 13-cv-412 (Judge Anthony J. Trenga)

# THE CANCER FOUNDATION'S REPLY BRIEF
# IN SUPPORT OF ITS CROSS-APPEAL

Michael J. Lockerby
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Sixth Floor
Washington, D.C. 20007-5109

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee Japanese Foundation for Cancer Research certifies the following:

1.     The full name of every party or amicus represented by me is:

Japanese Foundation for Cancer Research.

2.     The name of the real party in interest represented by me is:

Same as above.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Michael J. Lockerby, Richard G. Stoll, Andrew S. Baluch, Simon J. Elliott, Foley & Lardner LLP.

June 16, 2014

/s/ Michael J. Lockerby
Michael J. Lockerby

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................1

STATEMENT OF THE STANDARD OF REVIEW ................................................7

ARGUMENT ....................................................................................................10

I. THE CANCER FOUNDATION'S CROSS-APPEAL IS PROPER AND CONSISTENT WITH THIS COURT'S PRECEDENTS ..................10

II. THE CANCER FOUNDATION DID NOT WAIVE ITS RIGHT TO CROSS-APPEAL BY FOLLOWING THE PTO'S PROCEDURES. ..........11

III. THE UNAUTHORIZED DISCLAIMER RESULTED FROM A "CLERICAL" ERROR WITHIN THE MEANING OF SECTION 255. ..................................................................................................15

    A. The Undisputed Facts Establish—As a Matter of Law—That the Terminal Disclaimer Was Filed Because of a "Clerical Mistake." ..........................................................................15

    B. Section 255 Permits Correction of "Clerical" Mistake That Is Not Limited in Scope to "Typographical" or "Minor" Error..............19

    C. "Clerical Error" Within the Meaning of the Statute Includes Mistakes By Someone Whose Job Function Is "Clerical."..................20

    D. The Rationale of *Carnegie Mellon* Supports Finding the Error in This Case to Be Both "Clerical" and Correctable..........................21

    E. The Rationale of This Court's Decision in *In re Dinsmore* Supports Issuance of the Requested Certificate of Correction. ..........23

IV. THE REFUSAL TO ISSUE A CERTIFICATE OF CORRECTION WAS ARBITRARY, CAPRICIOUS, OR AN ABUSE OF DISCRETION.................................................................................26

CONCLUSION .................................................................................................29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amkor Technology, Inc. v. Tessera, Inc.*,
　IPR2013-00242 (PTAB May 22, 2014) .................................................................4, 5, 8, 29

*Bailey v. Dart Container Corp.*,
　292 F.3d 1360 (Fed. Cir. 2002)..............................................................................11, 12

*Barton v. Adang*,
　162 F.3d 1140 (Fed. Cir. 1998)...................................................................................8

*Carnegie Mellon Univ. v. Schwartz*,
　105 F.3d 863 (3d Cir. 1997).............................1, 4, 11, 16, 21, 22, 23, 24, 25, 29, 30

*Darby v. Cisneros*,
　509 U.S. 137 (1993)..................................................................................................15

*In re Dinsmore*,
　No. 2013-1637 (Fed. Cir., June 10, 2014) ...................................................25, 26, 27

*Esso Std. Oil Co. v. United States*,
　559 F.3d 1297 (Fed. Cir. 2009)................................................................................22

*Exela Pharma Servs., LLC v. Focarino (Lee)*,
　No. 13-1206 (Fed. Cir. Feb. 3, 2014)........................................................................5

*FCC v. Pottsville Broadcasting Co.*,
　309 U.S. 134 (1940)....................................................................................................9

*In re Gartside*,
　203 F.3d 1305 (Fed. Cir. 2000).....................................................................2, 6, 8, 28

*George E. Warren Corp. v. United States*,
　341 F.3d 1348 (Fed. Cir. 2003).................................................................................15

*Giesler v. United States*,
　232 F.3d 864 (Fed. Cir. 2000) ..................................................................................26

*Glaros v. H.H. Robertson Co.*,
　797 F.2d 1564 (Fed. Cir. 1986)...................................................................................7

*Itochu Bldg. Prods. v. United States*,
　733 F.3d 1140 (Fed. Cir. 2013).................................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................10

*Roberts v. United States*,
    745 F.3d 1158 (Fed. Cir. 2014) .............................................................10

*In re Rosuvastatin Calcium Patent Litig.*,
    703 F.3d 511 (Fed. Cir. 2012) ..........................................................25, 28

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ...............................................................................28

*Suffolk Techs., LLC v. AOL Inc.*,
    No. 13-1392, 2014 U.S. App. LEXIS 9697 (Fed. Cir. May 27, 2014) ...................14

*Superior Fireplace Co. v. Majestic Prods. Co.*,
    270 F.3d 1358 (Fed. Cir. 2001) ...........................................8, 21, 22, 26

*Vectra Fitness, Inv. v. TNWK Corp.*,
    162 F.3d 1379 (Fed. Cir. 1998) .............................................................27

**Statutes**

5 U.S.C. §§ 701-06 ........................................................................................5

5 U.S.C. § 706(2)(A) .....................................................................................8

35 U.S.C. § 251 ............................................................................................25

35 U.S.C. § 253 ..............................................................................2, 8, 26, 28

35 U.S.C. § 255 ...............1, 2, 3, 4, 6, 8, 11, 12, 13, 14, 15, 17, 20, 21, 22, 28, 31

Administrative Procedure Act .........................................................................5

**Other Authorities**

37 C.F.R. § 1.182 ...................................................................................14, 16

Fed. R. Civ. P. 56(c) ...............................................................................17, 18

H.R. Rep. No. 79-1980, at 289 (1946) ...........................................................8

MPEP § 1490 ..............................................................2, 3, 12, 13, 14, 16

## SUMMARY OF ARGUMENT

On cross-appeal, The Cancer Foundation seeks the same relief that it previously sought in Count Two of its Complaint but that the District Court denied. Pursuant to 35 U.S.C. § 255 ("Section 255"), The Cancer Foundation seeks to have the PTO issue a Certificate of Correction for the terminal disclaimer to which its Complaint refers as "The Unauthorized Disclaimer" (A1003). The authority upon which The Cancer Foundation's cross-appeal is based includes, in addition to the plain language of the statute itself, the case of *Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863 (3d Cir. 1997), a case in which the PTO now admits there was "clerical" error.[1] In *Carnegie Mellon*, the PTO readily granted the patent owner

---

[1] A copy of the Certificate of Correction issued to Carnegie Mellon is reproduced below:



1

such a Certificate of Correction even though the "clerical error" was that of the attorney of record (who made the same mistake twice) and the disclaimer had already been published in the *Official Gazette*.  In this case, however, the PTO denied The Cancer Foundation any relief based on the assertion that withdrawal or correction of the terminal disclaimer was expressly prohibited by Section 255.  The PTO's "erroneous interpretation of law" is—in and of itself—sufficient to establish "abuse of discretion."  *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000).

The PTO's interpretation of Section 255 is inconsistent with the plain language of the statute.  As enacted by Congress, the statute expressly permits correction "[w]henever a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the Patent and Trademark Office, appears in a patent and a showing has been made that such mistake occurred in good faith." 35 U.S.C. § 255.  Upon its recordation by the PTO, a terminal disclaimer is "considered as part of the original patent." 35 U.S.C. § 253.  It therefore would take an act of Congress for the Certificate of Correction procedure to be *unavailable* for an erroneously filed terminal disclaimer.  Yet the PTO has declared that the statutory "mechanisms to correct a patent" (including Section 255) "are not available to withdraw or otherwise nullify the effect of a *recorded* terminal disclaimer."  MPEP § 1490 (emphasis added).

At the time that The Cancer Foundation learned of the clerical error that resulted in submission of The Unauthorized Disclaimer, "the PTO had not published The Unauthorized Disclaimer or otherwise made it a matter of public record anywhere."  (A1113).  By any reasonable construction of the word "recorded," The Unauthorized Disclaimer was not yet "a recorded terminal disclaimer" within the meaning of MPEP § 1490.  But rather than permit withdrawal or correction, the PTO posted The Unauthorized Disclaimer on the Internet site—making The Unauthorized Disclaimer public for the very first time.  (A1114).  Then, the PTO proclaimed that permitting correction of a "recorded" terminal disclaimer would violate the "policy" reflected in MPEP § 1490[2] and therefore was ***prohibited*** by Section 255.  (A999-1000).

Throughout the proceedings before the agency and the District Court, the PTO repeatedly asserted that it had no authority whatsoever—under Section 255 or any other statute or regulation—to permit correction or withdrawal.  (A929, 975, 996-97, 1047, 1360-62, 1380-84, 1387).  Now, by way of qualifying statements buried in footnotes and elsewhere, the PTO seeks to—in effect—rewrite the scope

---

[2] Arguably, this "policy" should not have applied here because—as of the December 13, 2011 filing of The Cancer Foundation's initial petition, The Unauthorized Disclaimer had not yet been "recorded" in the *Official Gazette* or anywhere else.  (A1010).

3

of its statutory authority. The statute was no bar to the issuance of a Certificate of Correction in *Carnegie Mellon,* even though the terminal disclaimer at issue had been published in the *Official Gazette* and otherwise "recorded" for more than a year before the attorney sought to expunge it. Yet in opposition to The Cancer Foundation's cross-appeal, the PTO asserts that "when a terminal disclaimer is filed, the PTO has little, if any, power to decide," and that "a terminal disclaimer becomes effective automatically upon filing, without the need for any intervening exercise of discretion by PTO." (Dkt. #49) (p.17 n.3) (citations omitted). Meanwhile, the PTO has issued a decision in another case holding a terminal disclaimer "in abeyance until the instant proceeding terminates or a final written decision is issued." *Amkor Tech., Inc. v. Tessera, Inc.*, IPR2013-00242 (PTAB May 22, 2014). (A1454). So which of the two positions espoused by the PTO just last month is correct? Does the statute provide that "a terminal disclaimer becomes effective automatically upon filing," as the PTO told this Court? Or does the PTO in fact have the discretion that it exercised in *Amkor Technology* to hold a previously filed terminal disclaimer "in abeyance" pending a final decision?

The only consistency in the PTO's positions has been its insistence that its decisions should be immune from judicial review. In other recent proceedings, the PTO has at least been candid with this Court about its position, agreeing in oral argument that "the PTO can act unlawfully and nobody can challenge it." *Exela*

*Pharma Servs., LLC v. Focarino (Lee)*, No. 13-1206 (Fed. Cir. Feb. 3, 2014). In this case, the PTO has been less overt about its position, but the result that it seeks is the same. The PTO insists that—if no statute or regulation "***requires*** the PTO to withdraw a recorded terminal disclaimer" (<u>Dkt. #49</u>) (p.1)—whatever rationale it now tries to serve up must be rubber stamped by the federal judiciary. The PTO's interpretation would effectively read the applicable standards of review—including "abuse of discretion" and "arbitrary and capricious"—right out of the APA. To survive judicial review, the PTO must do more than come up with a supposedly "rational explanation for its decision." (<u>Dkt. #49</u>) (p.1). Under this Court's precedents, the PTO's decision represents an abuse of discretion where—as here— it "is based on an ***erroneous interpretation of law*** or clearly erroneous factfinding, or … represents an unreasonable judgment in weighing relevant factors." *In re Gartside*, 203 F.3d at 1315-16.

The same "abuse of discretion" standard applies regardless of whether the PTO's authority to correct a terminal disclaimer is (1) merely inherent (as the District Court held), (2) expressly codified in Section 255 (as The Cancer Foundation contends), or (3) more or less non-existent (as the PTO has consistently argued). On the record of this case, the various explanations served up by the PTO will not withstand even cursory scrutiny. The events that led to the erroneous filing of The Unauthorized Opposition are so *sui generis* that the District Court

5

called it an "extraordinary circumstance." (A21). The PTO's professed concern about the "precedent" that this case might set is therefore irrational. And if the PTO was **really** concerned about potential reliance by the public on The Unauthorized Disclaimer, it would not have responded to The Cancer Foundation's initial petition by posting the disclaimer on the Internet for the very first time. These are among the reasons that the District Court found **both** an "abuse of discretion" **and** an "arbitrary and capricious" agency action:

> The PTO was presented with the extraordinary circumstance of a patentee threatened with the loss of its patent because of the unauthorized filing of a disclaimer. In refusing to withdraw the unauthorized disclaimer, the PTO acted based on an erroneous legal view concerning the extent to which the Foundation was bound by its counsel's conduct and made no factual findings that would justify not withdrawing that unauthorized filing based on any particularized harm or prejudice to the PTO's institutional interests or the public interest. Nor can the Court find any such justification based on the administrative record.

(A21).

In its zeal to defend its decision at all costs, the PTO persists in characterizing the record in ways that are demonstrably incorrect. Once again, the PTO insists that the communications from Japan to U.S. counsel "appeared only to request information about how to disclaim the patent." (Dkt. #49) (p.19 n.4). As the District Court observed, however, the fax from Japan expressly "*instruct[ed]*" U.S. Counsel to "abandon the captioned patent positively and invalidate this patent

before the case lapses by non-payment of the next maintenance fees, which will be due on August 27, 2012." (A4) (emphasis added). Such deliberate distortions of the record suggest that the PTO has lost sight of the fundamental principle that "[t]he law is not a sport where winning has been called everything, and neither a trial nor an appeal should be only an exercise in gamesmanship." *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1568 (Fed. Cir. 1986). For the PTO, "winning isn't everything; it's the only thing." On every level, this is one case that the PTO deserves to lose.

## STATEMENT OF THE STANDARD OF REVIEW

The interpretation of Section 255 upon which the PTO based its Final Decision is subject to *de novo* review. *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1366 (Fed. Cir. 2001); *Barton v. Adang*, 162 F.3d 1140, 1144 (Fed. Cir. 1998). The PTO does not concede that the standard for issuing a Certificate of Correction is the same for a terminal disclaimer as for any other "part of the original patent." 35 U.S.C. § 253. And in this case, the PTO—in contrast to its position in *Amkor Technology*—contends that a terminal disclaimer is "recorded" immediately and automatically upon its receipt by the PTO. The Cancer Foundation's cross-appeal therefore presents questions of law in addition to the issue whether the PTO abused its discretion and was arbitrary and capricious.

7

The PTO concedes that denial of a Certificate of Correction is reviewable for "abuse of discretion" but posits a demonstrably incorrect standard of review. One of the ways in which the PTO does so is by asserting that "abuse of discretion" has the same meaning as "arbitrary and capricious" in 5 U.S.C. § 706(2)(A). (Dkt. #49) (pp.15-16, 27). Both the text and the legislative history of the APA show otherwise. H.R. REP. NO. 79-1980, at 289, n.22 (1946). The PTO also insists that, for purposes of The Cancer Foundation's cross-appeal, its Final Decision is not subject to this Court's interpretation of the APA's "abuse of discretion" standard as articulated in *In re Gartside* or any other case. Instead, the PTO cites the pre-APA decision in *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 141-44 (1940) for the proposition that it can exercise its discretion "in any rational manner" consistent with the governing statutes and regulations. (Dkt. #49) (p.16). But *Pottsville* does not actually say this. The statement that comes closest is the following:

> Administrative agencies have **power themselves to initiate inquiry**, or, when their authority is invoked, to control the range of **investigation** in ascertaining what is to satisfy the requirements of the public interest … . To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play. They require that interested parties be afforded an **opportunity for hearing** and that judgment must express a **reasoned conclusion**.

*Pottsville*, 309 U.S. at 142-43 (emphasis added). *Pottsville* simply does not provide the PTO with the unfettered discretion that it now asserts. Moreover, in

8

this case, the PTO disclaimed any "power … to initiate inquiry" or to conduct an "investigation." To the contrary, the PTO asserted that it lacked any authority to consider the circumstances that led to the filing of The Unauthorized Disclaimer. (A929, 996-97). The PTO even disclaimed the "competency" to do so. (A1360). The PTO's Final Decision therefore does not express the type of "reasoned conclusion" required by *Pottsville*.

The PTO's formulation of the "arbitrary and capricious" standard of review is also not faithful to either the letter or the spirit of the precedents upon which it purports to the based. Citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), the PTO asserts that "the only question is whether the agency considered the relevant issues and offered a rational explanation for its decision." (Dkt. #49) (p.1). That is not what the Supreme Court actually said in *State Farm*. The "arbitrary and capricious" standard requires judicial review of "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43 (citation omitted). It requires reversal if the PTO's explanation "runs counter to the evidence" or is "implausible." *Id.* (citation omitted). And it does not permit this Court to "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citation omitted). Under *State Farm*, the "arbitrary and capricious" standard is simply not the rubber stamp that the PTO seeks in this case.

## ARGUMENT

### I. THE CANCER FOUNDATION'S CROSS-APPEAL IS PROPER AND CONSISTENT WITH THIS COURT'S PRECEDENTS

The Cancer Foundation's cross-appeal satisfies every permutation of this Court's test for when a cross-appeal is proper. First, the cross-appeal seeks to "reverse or modify the trial court's judgment." *Roberts v. United States*, 745 F.3d 1158, 1160 n.1 (Fed. Cir. 2014). The Cancer Foundation obviously does not seek reversal of the District Court's Final Judgment ordering the PTO to "withdraw from the public record the terminal disclaimer." (A24). This was part of the relief requested by The Cancer Foundation in Count Three of its Complaint ("Withdrawal of The Unauthorized Disclaimer"). (A1032-33). The District Court stopped short, however, of ordering the PTO to issue a Certificate of Correction as The Cancer Foundation had sought in Count Two ("Correction of the Error Through a Certificate of Correction"). (A1032). By way of its cross-appeal, The Cancer Foundation seeks to modify the District Court's Final Judgment to include this additional relief.

Second, the cross-appeal is proper because The Cancer Foundation seeks to "enlarge its own rights under the judgment." *Bailey v. Dart Container Corp.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002). By statute, a Certificate of Correction gives the corrected patent "the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected

form." 35 U.S.C. § 255. Absent a Certificate of Correction, the legal effect of a terminal disclaimer that has merely been withdrawn is "unclear." *See Carnegie Mellon,* 105 F.3d at 866. More importantly, a Certificate of Correction is a document that is physically attached to the patent itself. It therefore provides much better notice of the correction without the need to search through the patent's voluminous file history. The Cancer Foundation clearly has an interest in widely publicizing—to potential licensees and others—the fact that its Cancer Treatment Patent remains fully intact.

Finally, The Cancer Foundation's cross-appeal seeks to "lessen the rights of its adversary." *Bailey*, 292 F.3d at 1362. The PTO's Initial and Final Decisions reflect the adoption by fiat of a blanket prohibition on the use of Section 255 to correct terminal disclaimers. (A929, 996).

## II. THE CANCER FOUNDATION DID NOT WAIVE ITS RIGHT TO CROSS-APPEAL BY FOLLOWING THE PTO'S PROCEDURES.

The PTO's erroneous interpretation of Patent Act Action 255 is reflected in its rules of practice, including MPEP § 1490. The PTO's rules of practice expressly bar patent owners from even requesting the agency to issue a Certificate of Correction for a terminal disclaimer. It is therefore both disingenuous and cynical for the PTO to now claim that The Cancer Foundation has somehow waived its right to challenge the PTO's erroneous interpretation of Section 255 on cross-appeal. The judiciary—not the PTO—has the final say as to this question of

11

law.  Although barred by MPEP § 1490 from obtaining a Certificate of Correction from the PTO in the first instance, The Cancer Foundation sought this relief at the first available opportunity.  That opportunity first presented itself when the PTO sought judicial review in the District Court.

In the District Court, The Cancer Foundation sought "Correction of the Error Through a Certificate of Correction" in Count Two of its Complaint.  (A1032).  In support of the requested relief, The Cancer Foundation argued that "[t]he present error is clerical in nature and does not affect the scope of the claims."  (A1032).  In the District Court, the PTO argued that The Cancer Foundation had waived the right to seek a Certificate of Correction.  (A1378-79).  The District Court, however, was obviously satisfied that the Section 255 issue was properly before it and therefore addressed the issue on the merits.  (A15-16 n.12).  As a result, whether The Cancer Foundation is entitled to a Certificate of Correction is properly before this Court because the District Court "clearly recognized, considered, and ruled on the issue."  *Suffolk Techs., LLC v. AOL Inc.*, No. 13-1392, 2014 U.S. App. LEXIS 9697, *11 n.2 (Fed. Cir. May 27, 2014) (citing *Holmer v. Harari*, 681 F.3d 1351, 1356 n.3 (Fed. Cir. 2012)).

The record of proceedings before the PTO is clear that—upon learning of The Unauthorized Disclaimer—The Cancer Foundation sought its nullification forthwith by filing a petition under 37 C.F.R. § 1.182 ("Questions not specifically

12

provided for"). (A900). Under the PTO's procedures that were in effect at the time—and that remain in effect to this very day—such a petition was the only means by which The Cancer Foundation could seek any relief. *See* MPEP § 1490.VI.B. ("A petition under 37 CFR 1.182, along with the required petition fee, may be filed, if withdrawal of the terminal disclaimer is to be requested."). As filed, The Cancer Foundation's petition requested "nullification of the subject disclaimer" through any available means. (A902).

The PTO dismissed this petition on the grounds that "[t]he mechanisms to correct a patent … [including] Certificate of Correction (35 U.S.C. 255) … are not available to withdraw or otherwise nullify the effect of a recorded terminal disclaimer." (A929). At that juncture, The Cancer Foundation could have sought immediate judicial review of the PTO's decision—including its erroneous interpretation of Section 255.[3] Instead, The Cancer Foundation first requested reconsideration. By so doing, The Cancer Foundation never conceded that the PTO's interpretation of Section 255 was correct. Rather, The Cancer Foundation acknowledged that "[t]he Dismissal **asserts** that the PTO lacks a mechanism to withdraw or otherwise nullify an erroneously filed Disclaimer." (A943) (emphasis added). The Cancer Foundation then attempted to convince the agency that it

---

[3] *See Darby v. Cisneros,* 509 U.S. 137, 146 (1993).

possessed *inherent* authority even under the PTO's narrow reading of the statutes and rule of practice.

On reconsideration, the PTO affirmed its initial decision and reiterated its view that "none of these statutes ([i.e., §§ 251, 255, 257, 305]) or rules of practice, provide a means by which the Office or patentee can withdraw a recorded disclaimer in an issued patent." (A996). Throughout the administrative proceedings below, the PTO steadfastly maintained that Section 255 is not available to correct a recorded terminal disclaimer. This interpretation of law is not immune from judicial review as the PTO now insists.

This Court's precedents are clear that The Cancer Foundation was "not required to perform useless acts to exhaust administrative remedies." *George E. Warren Corp. v. United States*, 341 F.3d 1348, 1351 (Fed. Cir. 2003). By virtue of MPEP § 1490 alone, it would have been futile for The Cancer Foundation to have separately petitioned for a Certificate of Correction because "there was no reasonable prospect that [the PTO] would have changed its position" in the face of the PTO's definitive position on the issue. *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1147 (Fed. Cir. 2013). Therefore, "no purpose" would be "served by exhaustion here." *Id.*

Under the circumstances, the PTO cannot credibly fault The Cancer Foundation for seeking relief via petition under 37 C.F.R. § 1.182. That is the rule

identified in the PTO's Manual "if withdrawal of the terminal disclaimer is to be requested."   MPEP § 1490.VI.B.   Tellingly, the PTO issued a Certificate of Correction to Carnegie Mellon after the university filed only a "Petition to Expunge" the disclaimer.  *Carnegie Mellon*, 105 F.3d at 865.  A review of the transaction history of that patent's wrapper reveals that Carnegie Mellon filed only a single petition to expunge after it learned of the mistaken disclaimer in 1991— not a separate request for a Certificate of Correction.  (A1466-68).  The PTO's insistence that The Cancer Foundation should have followed a different procedure than the one specified in its Manual and that Carnegie Mellon used to obtain a Certificate of Correction highlights why—in addition to being based on an erroneous interpretation of the law—the PTO's Final Decision was both an "abuse of discretion" and an "arbitrary and capricious" agency action.

## III.   THE UNAUTHORIZED DISCLAIMER RESULTED FROM A "CLERICAL" ERROR WITHIN THE MEANING OF SECTION 255.

### A.   The Undisputed Facts Establish—As a Matter of Law—That the Terminal Disclaimer Was Filed Because of a "Clerical Mistake."

In the proceedings before the agency and at the District Court, the PTO never disputed the factual basis for The Cancer Foundation's claim of "clerical error."   Shortly after filing suit in the District Court, The Cancer Foundation moved for summary judgment.  (A27).  The PTO moved to delay briefing of The Cancer Foundation's summary judgment motion until after the PTO had certified

the administrative record. (A27). The District Court denied the PTO's motion. (A28). If the PTO disputed any of the material facts upon which The Cancer Foundation based its motion for summary judgment, it was required to identify the *evidence* upon which it disputed the fact in question. This requirement was imposed by Federal Rule of Civil Procedure 56(c), Local Rule 56(B), and the District Court's Order of April 30, 2013. (A1353).

Except with respect to one assertion in The Cancer Foundation's Statement of Undisputed Material Facts ("SUMF"), the PTO identified no factual disputes. (A1370). Even with respect to that particular SUMF (No. 16), the PTO's citation did not support the PTO's assertion of a purported dispute—which really did not involve a question of fact but rather the legal issue of when The Unauthorized Disclaimer should be deemed to have been "recorded."[4] On appeal, the PTO now asserts for the very first time that it did in fact dispute the material facts upon which The Cancer Foundation's summary judgment motion was based. (Dkt. #49) (pp.4-5). Actually, the PTO merely *objected* on the grounds that The Cancer Foundation had not cited the certified record of proceedings before the agency. (A1368). Needless to say, such an "objection" is insufficient to create a disputed

---

[4] This issue is addressed at length in The Cancer Foundation's opening brief. (Dkt. #46) (pp.7-8).

issue of material fact within the meaning of Fed. R. Civ. P. 56(c). And as the PTO is well aware, at the time that The Cancer Foundation moved for summary judgment, the PTO had not yet certified the administrative record. (A28). By the time briefing was complete, the PTO had certified the record, and The Cancer Foundation filed a revised SUMF with the citations that the PTO represents to this Court were lacking. (A29).

At this juncture, the factual predicate for this Court's review of the District Court's Final Decision is fixed. The PTO does not get a "do-over" more than a year after the parties' cross-motions for summary judgment were briefed and argued. For purposes of this Court's analysis of the "clerical error" issue, the material facts include the following:

1.  Ms. Yoshiko Kinoshita, a paralegal at Kyowa Patent and Law Office ("Japanese Licensee Counsel"), misunderstood a question that was asked of her during a telephone call with Ms. Atsuko Saito, a representative of the firm's client Kyowa Hakko Kirin Co. Ltd. ("KHK").[5] KHK was a licensee of the Cancer Treatment Patent. (A3-4; A963).

---

[5] The fact that the first word of Licensee KHK's name—Kyowa—is the same as the first word of the name of the law firm is coincidental. The two entities are not under common ownership or otherwise affiliated with one another. (A1112 n.6).

2.    Ms. Saito asked merely "*whether* it is possible to actively disclaim a U.S. patent."  Ms. Saito "was only seeking information concerning their knowledge of U.S. practice" and "did not request disclaimer of any patent."  (A973) (emphasis in original).

3.    Ms. Kinoshita misunderstood Ms. Saito's question and mistakenly took it as an instruction to disclaim the Cancer Treatment Patent.  (A 963).

4.    Without first reporting back to KHK with an answer to Ms. Saito's question, and without requesting written instructions from KHK, Ms. Kinoshita sent a letter to Foley & Lardner, LLP ("Foley") stating: "Our clients would like to abandon the captioned patent [6,194,187] positively and invalidate this patent before the case lapses by non-payment of the next maintenance fee which will be due on August 27, 2012."  (A967).

5.    The foregoing action was plainly contrary to Ms. Saito's instruction to simply report back with "information concerning [Japanese Licensee Counsel] knowledge of U.S. practice."  (A973).

6.    The instruction to disclaim the Cancer Treatment Patent also violated the contractual obligations of Japanese Licensee Counsel's client,

18

KHK. As a licensee, KHK was required to "maintain the Patent, including payment of all maintenance fees." (A968).

The foregoing facts establish—as a matter of law—that the error leading to the filing of The Unauthorized Disclaimer was that of a "clerical" employee and was otherwise "clerical."

### B. Section 255 Permits Correction of "Clerical" Mistake That Is Not Limited in Scope to "Typographical" or "Minor" Error.

Under the PTO's interpretation, the only "clerical" mistake that could be corrected under the statute is one that is also "typographical" *and* "of minor character." The statute, however, permits correction of "a mistake of a *clerical or typographical nature*, *or of minor character*." 35 U.S.C. § 255 (emphasis added). It says "or"—not "and." Nevertheless, the PTO asks this Court to ignore the words "clerical" and "or" in Section 255. According to the PTO, a clerical error occurs only when "'the numbers for the patent being disclaimed … were inadvertently transposed,' or in which the alleged error involved some similar "inadvertency [that] is clear from the record." (Dkt. #30) (p.11) (citing A996 n.4). As an example, the PTO cites 6,444,**316** written as 6,444,**136.** (A996 n.4, citing MPEP § 1490). Such an error may indeed be "clerical." But it is also "typographical." Transposing numbers might appear to be "minor." The PTO's position, however—at least in this case—is that the consequences of filing a terminal disclaimer are such that it can *never* be "of minor character." (Dkt. #30) (p.21);

19

(Dkt. #49) (p.27); (A1380-83). And in many cases, such a transposition might not necessarily be "clear from the record." In *Carnegie Mellon*, for example, there was no transposition, and the error was certainly not "clear from the record"—not even to the patent owner's attorney, who made the same mistake twice. By its own admission, the PTO has imposed limitations on the availability of Certificates of Correction under Section 255 that are nowhere to be found in the statute.

**C.   "Clerical Error" Within the Meaning of the Statute Includes Mistakes By Someone Whose Job Function Is "Clerical."**

This Court has previously observed that the dictionary defines "clerical" as "relating to an office clerk or office work" *Superior Fireplace*, 270 F.3d at 1369 (citation omitted). The PTO's Opposition quotes *Superior Fireplace* for its discussion of both "typographical" and "clerical" errors but elides the distinction between the two that this Court specifically found. "Clerical error" occurs when "a subordinate act[s] contrary to binding instructions." *Esso Std. Oil Co. v. United States*, 559 F.3d 1297, 1307 (Fed. Cir. 2009) (alteration in original) (quoting *Ford Motor Co. v. United States*, 157 F.3d 849, 860 (Fed. Cir. 1998). In both *Superior Fireplace* and *Esso*, the Court focused on the *identity* of person who committed the error ("a subordinate") in addition to the nature of the error ("acting contrary to binding instructions"). In this case, the undisputed facts establish that a "subordinate" (a paralegal in Japan) acted contrary to the binding instructions of her law firm's principal and therefore made a "clerical error."

20

### D. The Rationale of *Carnegie Mellon* Supports Finding the Error in This Case to Be Both "Clerical" and Correctable.

The PTO attempts to distinguish *Carnegie Mellon* as a case involving "a simple substitution of patent numbers—a genuine clerical error evident on the face of the administrative record." (Dkt. #49) (p.14). Having now finally conceded that the error at issue in *Carnegie Mellon* was "clerical," the PTO cannot credibly dispute that the error at issue in this case was also "clerical" within the meaning of Section 255.

In this case, the PTO repeatedly distorts the undisputed facts by characterizing the error in question as that of The Cancer Foundation's "attorney of record." In *Carnegie Mellon*, the error actually was that of the patent owner's attorney of record. The attorney, Schwartz, was licensed to practice before the PTO and retained to "prosecute and transact all business related to United States Patent No. 4,767,708 … and related United States Continuation Patent Application Serial Number 07/117,279." *Carnegie Mellon*, 105 F.3d at 865. In response to an obviousness type double patenting rejection in the *'279 application*, Schwartz prepared and filed a terminal disclaimer against the parent, the *'708 patent*. When the PTO advised Schwartz that no terminal disclaimer had been filed in the '279 *application*, Schwartz *refiled* the disclaimer in the '708 patent. Schwartz eventually filed the terminal disclaimer in the '279 application eight months later but took no action to investigate or correct the previously filed disclaimer in the

21

'708 patent. More than a year after the disclaimer in the patent had been recorded and published:

> Schwartz immediately filed a **Petition to Expunge** with the Commissioner of Patents and Trademarks. On September 10, 1991 (more than fifteen months after the disclaimer of the 708 Patent was originally published on May 29, 1990), the PTO published an Erratum in the Official Gazette, which stated that "all references to [the 708 Patent] should be deleted as the patent should not have been disclaimed." Supplemental Report at 4 n. 2. On December 5, 1991, the PTO directed that the erratum be attached to all soft copies of the 708 Patent furnished by the PTO.

*Id.* (emphasis added). Thereafter, Carnegie Mellon sued both Schwartz and the PTO. After a magistrate found that it was unclear whether the erratum would retroactively eliminate intervening rights, the PTO issued a Certificate of Correction that "corrects any residual error in [the 708 Patent] ... that may not have been corrected by the Erratum." *Id.* at 866. The Certificate of Correction was issued to *Carnegie Mellon* without the filing of anything more than the "Petition to Expunge," since the PTO's rules of practice at the time contained the very same limitations that they do now.

The error in *Carnegie Mellon* was not the mere transposition of digits as the PTO now argues. The decision to file the terminal disclaimer—*twice*—was not made by a paralegal or even a Japanese attorney. The error was that of a U.S. attorney, registered to practice before the PTO and with power of attorney from

Carnegie Mellon University to file a terminal disclaimer. The error was presumably not clear on its face to Schwartz, who compounded the error and made no effort to correct it for 15 months. The error was also not apparent to the PTO, which alerted Schwartz only to the failure to file a terminal disclaimer in the '279 application while proceeding to publish the disclaimer of the '708 patent in the *Official Gazette*. Notwithstanding these facts, the PTO granted a petition to expunge, issued an erratum, and—without any further action by Carnegie Mellon or its representatives—issued a Certificate of Correction. The PTO's actions in *Carnegie Mellon* simply cannot be reconciled with the agency's actions and representations to the Court in this case.

### E. The Rationale of This Court's Decision in *In re Dinsmore* Supports Issuance of the Requested Certificate of Correction.

A decision of this Court within the past week also supports the relief that The Cancer Foundation seeks by way of its cross-appeal. *See In re Dinsmore*, No. 2013-1637 (Fed. Cir., June 10, 2014). The patent owner in that case, Dinsmore, sought to overcome an obviousness type double patenting rejection. Accordingly, Dinsmore filed a terminal disclaimer over a prior patent that shared inventors but was not commonly owned. Because Dinsmore's patent was unenforceable while not commonly owned, Dinsmore sought to correct the terminal disclaimer by filing a reissue under 35 U.S.C. § 251.

23

In *In re Dinsmore*, this Court noted that a reissue was approved in *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511 (Fed. Cir. 2012) where the error occurred "because of 'chaos, confusion, and inexperience,' 'lack of legal training' in the patent department, 'the changing and limited personnel within that department,' and '*unintentional miscommunications' between personnel*." Slip Op. at 9 n.2 (emphasis added). A key consideration was whether the error was a mistake, which this Court characterized as "a *belief that is not in accord with the facts*." *Id.* at 11 (emphasis added) (citing Restatement (Second) of Contracts § 151)). This Court found that Dinsmore had not alleged or shown that there was any mistaken belief as to any key fact in the case. *Id.* at 10-11.

Instead, the Court in *Dinsmore* found evidence to infer an error of judgment. The disclaimer was filed to overcome an obviousness type double patenting rejection, in return for which the patent was granted. *See id.* at 11. The only defect in the patent was that it was not, at that time, enforceable because it was not co-owned with another patent. "On the record of this case, applicants are ultimately seeking simply to revise a choice they made, not to remedy the result of a *mistaken belief*. Theirs is not an error remediable under the reissue statute." *Id.* (emphasis added). This analysis reflects the important distinctions between correctable errors of belief or fact, and non-correctable errors of judgment that arise in other contexts. *See, e.g.*, *Giesler v. United States*, 232 F.3d 864 (Fed. Cir. 2000).

24

Importantly, in *Dinsmore*, this Court did not focus on the mere mechanics of whether the disclaimer had been filed but rather on whether the alleged mistake in filing was one of fact or of judgment. The distinction between the type of error (fact versus judgment) is consistent with the focus in *Superior Fireplace* on the "clerical" function of the person committing the error (*i.e.*, a "subordinate"). *See* 270 F.3d at 1369. In *Dinsmore*, this Court also focused on the **intent** of the filer— a factor specifically enumerated in the statute that the PTO seeks to read out of 35 U.S.C. § 253—and whether there was a *quid pro quo* suggesting intent.

Unlike the patent owner in *Dinsmore,* The Cancer Foundation received no *quid pro quo* for filing the disclaimer. Unlike the patent owner in *Dinsmore,* The Cancer Foundation has alleged and shown that the filing was in error and grounded in a belief "that is not in accord with the facts," *Dinsmore*, Slip Op. at 11, resulting from an 'unintentional miscommunication[]' between personnel." *Id.* at 9 n.2. In this case, the head of the PTO's Office of Petitions acknowledged that "a misunderstanding occurred between the licensee and the Japanese associate" and that "[t]his misunderstanding was compounded by the earthquake and tsunami that occurred on March 11, 2011 off the Japanese coast which caused a breakdown in communication between petitioner, the licensee, and the Japanese associate." (A975).

In short, even if the ***identity*** of the person making the error is irrelevant to finding a "clerical error" (as the PTO argues), the ***nature*** of the error at issue in this case was clerical. The error was not one of judgment. There was no mistaken understanding of the law. Rather, there was a mistaken understanding of facts and the patent owner's intention—a clerical error. Under the rationale of *Dinsmore*, the mistaken filing of the terminal disclaimer should be viewed as a correctable error of fact.

*Dinsmore* is also consistent with cases such as *Vectra Fitness, Inv. v. TNWK Corp.*, 162 F.3d 1379 (Fed. Cir. 1998) in which this Court has been unwilling to correct an attorney's strategic error in filing a terminal disclaimer. In contrast, errors of fact, or of clerical nature, may be corrected. *See*, *e.g. Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511 (Fed. Cir. 2012).

## IV.  THE REFUSAL TO ISSUE A CERTIFICATE OF CORRECTION WAS ARBITRARY, CAPRICIOUS, OR AN ABUSE OF DISCRETION.

The PTO's refusal to issue a Certificate of Correction to The Cancer Foundation was an "abuse of discretion" because its decision was "based on an erroneous interpretation of law." *In re Gartside*, 203 F.3d at 1315-16. On appeal, the PTO seems to concede that Section 255 permits correction of a terminal disclaimer but now contends that the error was not clerical. (Dkt. #49) (pp.25-26). This Court cannot affirm the Final Decision at issue on a different basis than the one articulated by the PTO. *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).

Nor do the PTO's alternative arguments provide a basis for affirming its decision. Indeed, under the section heading "[e]ven if permissible, under law, withdrawal of the disclaimer is not warranted" (A998), the PTO summarizes this section unambiguously with the sentence: "Accordingly, as stated in the prior decision, the USPTO will not grant a request to withdraw or amend a recorded terminal disclaimer in an issued patent on the grounds that the rules of practice and 35 U.S.C. 253 do not include a mechanism for withdrawal or amendment of such a terminal disclaimer." (A1000) (citations omitted). Thus, even when the PTO entertained the possibility that it might exercise some authority, the agency felt compelled to deny relief because it saw no statutory or regulatory "mechanism" to grant relief. In other words, in the agency's view, it lacked authority.

In this case, there is no principled way to square the PTO's reasoning and result with the contrary results in *Carnegie Mellon* and *Amkor Technology*. The first purported reason in the "[e]ven if permissible" section of the PTO's decision was that, "[u]pon filing, a proper disclaimer is of record" and thus "the patentee has relinquished his legal rights to the claims disclaimed." (A998). In *Carnegie Mellon*, however, it was undisputed that the disclaimer was filed by the university's attorney of record, was in the proper form, and was recorded. 105 F.3d at 865. The attorney filed the same disclaimer *twice*, and a notice of the disclaimer was published in the *Official Gazette*. *Id.* at 864-65. Under the PTO's

27

first stated rationale, the PTO would have been powerless to nullify the disclaimer that Carnegie Mellon had filed. Yet the PTO did exactly that by publishing an erratum in the *Official Gazette* and issuing a Certificate of Correction.

The decision's second purported reason was that "[t]he Office does not question the purpose of or intention in filing of a disclaimer in an issued patent," and thus a disclaimer "filed purposefully is as effective as one filed unintentionally." (A998). This reasoning likewise cannot be squared with *Carnegie Mellon* and the present case, as neither Carnegie Mellon nor The Cancer Foundation intended for its patent to be disclaimed. It also cannot be squared with the PTO's decision in *Amkor* to hold a terminal disclaimer in abeyance even after filing, or with this Court's willingness to consider the intent behind a terminal disclaimer in *Dinsmore*.

The third purported reason was that "the Office has long maintained that an applicant/patentee is bound by the actions or inactions of his voluntarily-chosen representative" and, therefore, "[t]he inquiry ended at the Office when the disclaimer was filed by an attorney of record for an assignee of record." (A999). Once again, Carnegie Mellon, as the assignee of record, should have been bound by the actions of its voluntarily-chosen representative. Yet it received a Certificate of Correction to fix its attorney's error.

The PTO's final purported reason was that, "as a general principle, public policy does not favour [sic] the restoration to the patent owner of something that has been freely dedicated to the public." (A999). Under this rationale, Carnegie Mellon was in a worse position than The Cancer Foundation because the university's disclaimer was in the public record for more than a year before its attorney filed a petition to expunge it. *Carnegie Mellon*, 105 F.3d at 865 (disclaimer filed March 15, 1990; *Official Gazette* published May 29, 1990; petition to expunge filed July 25, 1991). Here, in contrast, The Cancer Foundation filed a petition to expunge before any member of the public could even see the disclaimer, much less believe that the patent had been "freely dedicated."

In short, the rationale of the District Court's decision finding—with respect to the PTO's inherent authority—that the PTO abused its discretion and acted arbitrarily and capriciously applies with equal force to the express authority granted by Section 255.

## CONCLUSION

The PTO's decision to deny The Cancer Foundation a Certificate of Correction was and is the epitome of result-oriented jurisprudence. The District Court properly found the PTO's rationale to be wanting in every respect. The "policy" considerations articulated by the PTO simply do not withstand even the most cursory scrutiny. The public confidence in the integrity of the PTO's files

about which it has professed concern would be undermined rather than furthered if its Final Decision stands.  One of the many ways in which the PTO has abused its discretion is by interpreting the law—including Section 255—incorrectly.  On its face, this statutory provision permits the Certificate of Correction that The Cancer Foundation seeks, and there is no principled basis for arguing otherwise.  The Cancer Foundation therefore respectfully requests that the decision of the District Court be reversed to the extent that it failed to award a Certificate of Correction.

Date:  June 16, 2014

Respectfully submitted,

JAPANESE FOUNDATION FOR CANCER
RESEARCH


By:   /s/ Michael J. Lockerby
      Michael J. Lockerby

Michael J. Lockerby
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Sixth Floor
Washington, D.C. 20007-5109

*Counsel for Plaintiff-Appellee-Cross Appellant*
*Japanese Foundation for Cancer Research*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June 2014, I will file the foregoing corrected version of BRIEF OF THE CANCER FOUNDATION IN REPLY TO THE PTO'S RESPONSE IN THE CROSS-APPEAL with the Clerk of Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system, which will send a notice of electronic filing (NEF) to all counsel of record.


/s/ Michael J. Lockerby
Michael J. Lockerby

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

        The brief contains 6,964 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

        This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14pt Times New Roman Font.

        */s/* Michael J. Lockerby
        Michael J. Lockerby
        Counsel for Appellee
        Dated: June 17, 2014